All right, our third case for this morning is United States v. Moose. Mr. Van Zandt. Good morning, Your Honor. James Van Zandt with Blaine & Van Zandt for Defendant Carl Moose. May it please the Court, I'd like to start briefly by just explaining why this loss amount issue that we've brought up to the Court today is so important. I think it's no secret to the Court that loss amounts in fraud cases drive sentencing. It is the single most important factor that everything else flows from in determining what the defendant's sentence is. What's not talked about as much, and part of the reason why it's so important here, is that loss amount also dictates restitution that a defendant has to pay. Whatever the district court decides that the loss amount is under the Mandatory Victim Restitution Act, that's something that the defendant has to pay back to the victims ultimately. So even though the district court has the ability to decide the ultimate sentence outside of the guidelines range or something like that, what the restitution is depends strictly on the loss amount. So that's part of the reason that we're here today, because the district court decided that $480,000 is the loss amount in this case. Not only did that dictate what Mr. Moose's sentence was, but it also dictates what the restitution is. We understand that it's important. Here's the practical problem with your position. He takes $200,000 from people and does something with it. He buys the CEP shares, which then go to the company that he runs. Everybody's calling IWT, the Infinity Company. Then he takes more money, the $400,000, and he pockets it. Your theory is that as long as you pocket some of the money that you've stolen, if you do well enough with the rest of the money, you haven't injured the people that you stole the money that you pocketed from. That just doesn't really compute for me. If we were supposed to look at the gain from the $200,000, we should look at at least the potential gain from the other $400,000 and some, possibly by a market measure, not even this company, somehow or another. It seems to me the district court was taking actually a fairly conservative approach to say that whatever else this man did, he took $480,000 and some from people and kept it for himself. Why don't you owe restitution to them? They were deprived of the use of that money. The issue, Your Honor, is under the guidelines, especially under Application No. 3E, what matters is not just the gross loss amount. He didn't give back a dime of the $480,000. Maybe he gave back—this, of course, is contested because timing matters as well. Maybe he gave back something vis-à-vis the $200,000. Maybe he didn't. I'm not even sure about that.  Well, what matters is he did give back the property, Your Honor, and under Application No. 3E, we have to figure out what the fair market value of that property is. But that's not the— Suppose at the time he gave that control of the company over, the stock was worthless. Would the loss amount then be the full $680,000? That's actually an interesting question, Your Honor, and that's part of what's unclear from at least the way the Application No. plays out, because if the loss amount is determined— If that's unclear, then you seem to be wanting to play heads-I-win, tails-you-lose. That's not what I'm saying, Your Honor. What I'm saying is that the question is if the loss amount is determined at the time that the company was given over, which would be summer 2011, my position is that the value of the property at that time was approximately $610,000. Suppose it was zero. If it was zero, then if that was factually proven, yes, that would be the answer, Your Honor. So the loss amount then would depend upon the vagaries of the investments, the values of the investments in markets? I wouldn't say it's the—I suppose the best way to put it is the adjusted loss amount for purposes of sentencing would, and the idea that I'm seeing from the cases, Your Honor, and that specifically I'm talking about United States v. Mount here, the question is what is the position that the investors are in when the fraud is discovered? My position at this point, based on my understanding of the record, is that the investors gave Mr. Moore $680,000 total. Let me try it a different way. What stolen property was returned? That is the unit interests in IWT which owned— Those weren't stolen. Well, that's the property that he returned. I know, but they weren't stolen. That's the problem. What he took was the money, Your Honor. In exchange for that money, he returned to them the stock interest in CEP, and that's the question here. But he didn't. If he returned anything, he returned shares in IWT, and we have no notion directly of what those shares were worth at the time, other than by making the assumption that the CEP values flowed through somehow to the IWT shares, and we have to make the assumption that your timing is right, and we also have to make the assumption that we get to count the gain from the stock that he did buy, but we don't do anything with the other $480 some that he just lived off of. The guidelines tell us to use the higher of actual and intended loss. That is true, Your Honor, but— Why isn't $480,000 the intended loss here? We're actually in a different part of the guidelines, and that's, I think, part of the issue in the district court was clarifying this, is we first have to figure out what the actual intended loss is. That's the gross loss amount. Application note 3E then tells us we have to figure out what the adjusted loss is by subtracting from the gross loss amount what was given back, which gives us the adjusted loss amount, and that's exactly what this court said in Mount. Let me make this worse. Let's suppose the plan is not to buy stock, but it's to buy options, trade-in options. So, it's highly leveraged. There's a significant exposure to loss, and the defendant pockets a lot of money, sells. He raises some money by selling, I think, what Call put up. I'm not sure I've got the right options in the right direction, but he winds up losing terribly with the investment. So, he not only loses the money that he actually invested in the options, but he and his customers are exposed to additional liability on the options markets. I think I'm following, Your Honor. Are you saying that the loss is worse? So, let's say the loss, instead of being $680,000 under these circumstances, would be $2 million, $2.5 million. My understanding from the guidelines, if that was the actual loss the investor suffered, that would matter. Now, you then have to consider, if the defendant did give back some sort of property, which I assume you're talking about the options, the next step is to figure out what the fair market value of that is. And if it's way negative, then the answer is the actual loss, because the adjustment would be zero. That's my understanding. So, he steals half a million, roughly, and the loss is $2.5 million. I believe, if I'm understanding your hypothetical correctly, that would be computed under the actual loss portion of the calculation, not the adjustment under application of 3E. That's part of the reason why this got a little complicated in the district court, was we're talking about several different things here. We're talking about, first of all, what is the actual or intended loss to the victims. Well, and the big problem with this is I just keep having this feeling that we're talking, or that some people have been talking about apples and oranges, because we've got the initial amounts of money that he took from the investors, $680,000 and some. He seems to have done what he said he was going to do with $200,000 of it. So, whether that's a loss or not, the district court says, I'm not going to count that as a loss, because you kind of did what you said you were going to do. The fate is up. The fate is down. It doesn't matter. Once you've invested in the market, you're assuming some market risk, which is why I have a problem with giving him the credit for the upside of the market risk on that $200,000. Then he takes the rest of it, the $480,000, and he lies. He doesn't do what he said he was going to do with it. It doesn't get converted into shares of stock, or it doesn't get converted into anything but his cars and his vacations, or whatever else he's doing with it. So, I don't see why we cross-subsidize the theft with the market risk that the investors just bought. I don't see why they relate to one another at all. Well, the idea, Your Honor, is what we're looking at in terms of, at least for sentencing purposes here, is the net detriment to the victims. Would you remind me, by the way, because we have a list of victims. It's redacted. We've got initials in the sentencing document. Are the very same people the ones who gave the $200,000 as gave the $480,000? That gets a little complicated, Your Honor. I've streamlined this in the briefs as best I can. There were a lot of transactions going back and forth. The best answer I can give you is that some of the first group was also part of the second group. But it's not a total overlap. Not a total overlap is my understanding. All right, that's good enough for right now. I would like to reserve a little bit of rebuttal time. I'd like to ask you about the supervised release issue that you've raised. Of course. First of all, you're seeking a full resentencing before a different judge, correct? Yes, Your Honor. Does Mr. Moose understand that that could produce a longer prison sentence for him? He is aware of that. He is, not just you. You've talked with him about that. We talked about this before we brought it up. He caught, in some respects, an unbelievable break with this, at least a very generous sentence here. And it's far from clear to me that another judge would be as understanding in this case. But if he wants to pursue it, so be it. With respect to the time of the supervised release term, at the end of the sentencing hearing, the judge asked, has the court missed anything? If I had been representing Mr. Moose at that point, I would have said, absolutely not. I want to get out of here before he changes his mind about this sentence. And the defense counsel said, no. So why should we not treat that as shutting down this argument about failure to explain two years of supervised release, along with a well-below-guideline prison sentence? Are you talking about just the time of the supervised release term or the length of the term? Any argument about supervised release that rests on failure to explain thoroughly enough why that condition was imposed? Well, I think the defense counsel did make the objections specifically to those three conditions, and there was no explanation from the trial court on why those objections were made. I thought you had a separate point, though, about the length. Oh, of the length, Your Honor. That's a harder question. I mean, the drug testing is mandatory, and Mr. Moose has a history of alcoholism, right? Yes. So that's pretty obvious. And then the objection to the visitation condition misstated what the actual condition was, which includes a condition that it be reasonable times at home and at work. So hard to see a reason for an objection there. Well, the problem is we don't know why the trial court said no, Your Honor, and that's the argument. How about because the objection misunderstood? If that's the correct answer, then that's what the trial court should have said, Your Honor, and that's the basic point is we don't know. So if that is the reason, that has to be in the record. And that's, I think, what this court has said, not just in the supervised release context, but in other contexts as well, that to review it, we have to know what the reason was. We've also said that district judges don't have to belabor the obvious in this context. So, okay, thanks. All right, you can save the rest of your time. Ms. Rodney. May it please the Court, Renee Rodney on behalf of the United States. Your Honor, the defendant, Carl Moose, stole $480,945 from the victim investors in this case, and he pocketed that money for his own use, and the district court correctly based its loss calculation on the amount of those stolen funds. So the government respectfully requests that the sentence be affirmed, that that loss calculation be deemed correct. But, you know, there are all sorts of arguments the government did not appear to make before the district court, such as this argument that the $480 wasn't used to buy CEP shares. And I just can't see where you made that argument, and I didn't see where you made the argument that the CEP stock was never returned. Well, the government's primary argument was based on the $480,000, Your Honor. In its sentencing papers, it pointed out to the court that $200,000 of that had been used to purchase stock, but the balance of that, which primarily consisted of new investors who did not pay into that $200,000 pot, they never had any right to any interest in IWT, because the defendant told some of them, I'm selling you my personal shares, which was a lie. So they got nothing in return for their investment. So what the government demonstrated for the district court was that that $480,000, the defendant diverted from his business account into other business accounts and for his own personal use. What if this had just been one big transfer of money, $680,000, of which he takes $200,000 and buys stock in CEP, which seems to have been doing relatively well for a while. It has a five-to-one split at some point. Everybody's sailing along, and then things go badly. But why shouldn't you take the gain from at least the shares that he did buy and offset against the loss? Well, there was no gain, Your Honor. What the defendant was not telling the victim investors was that CEP was not going to pay any dividends on its shares in the foreseeable future. But dividends are different from the market value. They introduced some evidence about market value of the shares. Right. It started off at $5 a share, then later went up to $10 a share. And then they went back down. It's like $4.07 a share at some point when they had some testimony about that? The defendant cited a line from a stock ledger that was produced in the discovery. It's the government's position that by 2011, the company's stock was worthless based on statements from the company's CEO. So what was your evidence for that? That was a year later. That was 2012, yeah. Those statements from the CEO, yes. And then we had minutes from board meetings in 2010 when the defendant sat on the board where they discussed the company's negative cash flow and financial difficulties. They had not actually brought the technology to market. So it wasn't producing anything during this period of investment between 2007 and 2011. But I believe your question was what if all $680,000 had been used to purchase? Yeah, just it all come in at once. Why not offset? Let's assume, I realize you're making a different attack that the $4.07 a share is not a good number. But if it is a good number, the district court never really delves into this, doesn't think it's relevant. So we don't have much of an exploration of what a fair market value for shares of either CEP or Infinity would have been at the time the defendant, you know, is caught at this. Shouldn't we know that? Shouldn't we look into that? Well, if the $680,000 was actually used to purchase shares of CEP stock on behalf of this LLC and every investor had a valid interest in that, there would be no prosecution here. The government is focusing on the money that the defendant obtained as a result of his fraudulent statements to the investors that he was going to use their money to purchase stock or provide them an interest in IWT. Those second half of the investors between September 2008 and through 2010, they don't have a valid claim to any CEP shares. Well, so let me ask you the same question. I understood from Mr. Van Zandt that this list of victims in the sentence includes some people who were in on the first $200 trash and other people in on the $480 trash. Is that wrong? Are these just the $480 people? No, there's an overlap of two investors who are in between sentences. So why are the two in that got what they were bargaining for? The two that overlapped into the second half of the group, those funds that the defendant collected from them was not used to actually purchase shares of stock. So they don't have anything in exchange for those funds. So their restitution amount is only based on the post-September 2008 payments. If they paid into the fund pre-2008 and the defendant used that money to actually, it's part of the $200,000 that he used to purchase shares of CEMP for the LLC, they still hold on to that interest. The government did not see the claim of restitution for that earlier money. But it's divided into nine who paid into the $200,000 amount and seven who paid the $480,945 amount with an overlap of two. So what it comes down to is the $480,000 figure was obtained by the defendant as a result of fraudulent statements to those investors. That's all the government was seeking to hold him accountable for under the loss amount, and the government even reduced that amount by $75,000 for restitution purposes that one of the victim investors was able to recoup. By unloading it on somebody else, right? Another victim investor, yes, who ultimately paid her own money to the defendant during the fraud scheme. On the substantive reasonableness of the sentence, did you want to address the Second Circuit's decision in Algaheim and Judge Rakoff's decision in the Adelson case? That speaks to policy disputes with the loss table. Well, the district courts are free to consider or reject policy arguments against the guidelines, but they're not required to comment on them or to deviate from the guidelines as a basis of those policy arguments. In this particular case, the district court acknowledged that the guidelines were not mandatory, and based on the arguments and mitigation that he cited for his below-guidelines sentence for the defendant, that shows that he was not driven solely by the loss amount in this case. So I don't think that the Second Circuit's comments in this case overrule what this court has previously said about policy arguments not being taken into account by the district court being detrimental to that court's imposition of sentence. So I wanted to talk to you a little bit about this supervised release business because, you know, defense counsel makes three objections to the terms of supervised release. And what does she get from the district court? Overruled. I mean, she doesn't get any explanation why, for example, the drug testing condition couldn't be lifted. Yes, he had an alcohol problem. No one has said he had a problem with any other kind of drug. Some kind of explanation. The probation officer visits. And just the one word, overruled, doesn't count as an explanation. It's a result, but it's not. And the interest on restitution, I think, she also raised. And this judge just didn't go into anything. And I guess the government does make this argument that he's discussed some of the 3553A factors when he's talking about imprisonment, but it's not clear how that carries over to his decisions on supervised release. On some records, it does obviously carry over. But this time, you know, he just gave her the back of his hand. The district court did respond overruled to each of the objections. Going into the pronouncement of the supervised release conditions and the sentencing transcript at the defendant's appendix, page 60, the court announced that it would be reading the conditions into the record. But reading them into the record isn't the same thing as explaining them. That's the problem. He let the defense counsel know that she would have an opportunity to be heard. The court went through all of the conditions. And toward the end, defense counsel noted, Your Honor, I have objections. I didn't want to interrupt you. And he permitted her to go through each of them. And then he just says, as you just conceded, the objection is overruled. Boom. I mean, like, why? What's the point of going through this if that's enough? Well, with respect to the interest on the fine, that was not actually a condition. So that objection really has no part as far as their objections to the terms of supervised release conditions. The drug testing condition, yes, was mandatory. The PSR documented the defendant's history of alcohol abuse. That condition can be changed later when he actually starts serving supervised release. It's true of all of them. So we wouldn't even bother with this discussion if that were enough. Right. I cannot say why the court only said overruled, but I can only say that it's supported by the record. The reasons for needing drug treatment based on his history of alcoholism was reported in the PSR. And as far as the objection to the probation officer's visits to his workplace, the conditions of supervised release also specified other conditions. Yeah, there were other options. I mean, I think he's concerned that if the probation officer were to pick on the workplace too often, that would make work difficult to sustain. You know, employers don't want probation officers or anyone else, for that matter, dropping in every so often. Right, but probation officers are presumed to apply the conditions in a reasonable way. So looking into the future, if that did pose a problem for the defendant, that condition could be changed, and there are other options listed on the conditions of supervised release. Counsel, reading the sentencing transcript, it looked like the defense was dancing on the edge of giving up acceptance of responsibility. At this stage of the case, if we were to remand, what would the government's position be on the acceptance of responsibility adjustment? At the sentencing, the government had reserved its position on acceptance because there was a blind plea entered in this case, no plea agreement, and we anticipated there would be an attack on the loss amount and were prepared to reserve acceptance if there are factual disputes that the defendant raised about his culpability in causing that loss amount. At the sentencing, the defendant, through counsel, acknowledged that he pocketed the $480,000 and proceeded with his legal argument on credit. So because only legal arguments were put forth, we did not object to the imposition of acceptance. We probably would not object going forward if it was sent back for a full resentencing. Okay. Thank you. If there are no other questions, the government respectfully requests that the district court sentence be affirmed. All right. Thank you. Anything further, Mr. Van Zandt? Just very briefly, Your Honor, I don't want to waste my time. I think just as this last point on the acceptance of responsibility issue, the defense was very clear that we are raising a legal argument. That's something from counsel that we want to make sure is very clear as a legal matter. It's not a factual matter, so that's, I think, something we've expressed to the district court as well. But to make that record clear, it's purely a legal issue. And Mr. Moose is arguing two years of supervised release was unreasonable, right? I think the issue is more the conditions, Your Honor. And I think based on our discussion here, that's really where the core problem is. Really? He's worried about the visitation and the drug conditions? No, I'm talking about the lack of, well, the drug conditions may be an issue too, but the lack of explanation is the real problem here. And this is leaving aside the problem of So you realize the judge could say, look, if this is such a big problem, then maybe you need to spend more time in prison and less time on supervised release. I suppose that is a possibility, Your Honor. I guess we'd have to cross that road when it comes to it. I don't really have a good answer on how we would handle that if that did come up. I hope you've thought about it, if that happens. I certainly am considering it now, Your Honor. Two other points I want to talk about briefly is that the government has made this argument several times, that it's only the second group of investors that matters. The first group got everything they wanted. If this was a case where Mr. Moose just put $485,000 in his pocket and the investors got nothing, I wouldn't be here. That's an easy case. What the government indicted him on as the first group was dilution. Their argument and their position in the indictment and how they obtained the indictment was he took parts of the first group's interests and gave it to the second group. That's why both groups are victims. It's not a situation where the second group got nothing and the first group got everything. The second group did get something. That's because everybody owned shares in the company, and the asset held by the company was the C&P shares. That's the idea, Your Honor. What the government is saying, and they said this again a few minutes ago, is the second group got nothing. That's not true based on the dilution allegation. They have to have got something or there would have been no dilution. Is there any evidence that any investor was able to recoup any money other than the $75,000 sale? It's unclear at that point after the 2011, Your Honor. I don't have any more information in the record. That could be revisited under your theory at a resentencing. That may have to be looked into. And under your theory, then if nobody got anything for the shares, it could be a $680,000 loss. I think it still matters what the fair market value was at the time the offense was detected. Ultimately, we've got fragmentary evidence on that point in this record. I think the best evidence we have is that around the time the offense was detected, the value of what the investors had was $610,000. What they did with it after that, I don't know. Well, that's pretty thin evidence. I mean, I realize counsel was trying to get that kind of evidence into the record, but it really wasn't explored that much. No, and that's part of the problem is that we know what we know, and that's what the record is. I wasn't trial counsel, so there's some limitations on that. We're not blaming you, but it is, in fact, the record that we're stuck with. I see my time has expired. If there's no more questions. I see none, and the court wants to thank you. You were appointed, I believe. Yes, Your Honor. And we appreciate your help for your client and for the court. Thank you for hearing us, Your Honor. And thanks as well to the government. We'll take the case under advisement.